# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ASHLEY MIYAKODA HALL,** | |
| **Plaintiff,** | **Civil Action No.: 1:18-cv-10138** |
| **v.** | |
| | |
| **REGIS COLLEGE,** | |
| **Defendant.** | |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

Plaintiff, Ashley Miyakoda Hall, is an undergraduate student at the Defendant, Regis College.  Hall who dreamed of becoming a nurse, chose Regis because of its Nursing program.  Because of the high caliber of her high school academic record, she was admitted as a pre-Nursing major and Regis paid for half her tuition.

Her dream became a nightmare when she was violently assaulted by her ex-boyfriend, another Regis student, during her sophomore year.  Her ex-boyfriend grabbed her by the neck, pushed her against the wall, and choked her to the point where she could not breathe. The day after the assault, Hall reported the assault to the Regis campus police and immediately obtained a restraining order from the Waltham District Court that was supposed to keep the abuser off campus and far away from her.  Hall explained to school officials that she was afraid, and Regis issued a mutual no-contact order to both Hall and her abuser.  But, from there, rather than protecting Hall, Regis, through its campus police and administration, assisted Hall's abuser in modifying the restraining order so he could remained on campus, ignored evidence of abuse to Hall, and without notification to her, investigated and punished *Hall*.  Her abuser only left campus after being criminal charged with violating the restraining order.  The Waltham District Court convicted him of criminal assault and battery as well as violation of his restraining order.

In the aftermath of the trauma of the assault, which already made it difficult for Hall to continue her studies, Regis denied simple, reasonable accommodations to Hall for her learning disabilities, dyslexia and ADD.  In one specific instance, Regis, despite having a policy that specifically allows for replacing the foreign language requirement with an expressive arts course, forbade Hall from doing so.  Instead, she attempted to comply with the requirement—a feat impossibly difficult someone with dyslexia.  The combination of Regis' failure to accommodate with the trauma of her assault had a devastating impact on Hall's grade point average.  By the end of her sophomore year, it had falled below the minimum allowed to remain in the Regis Nursing program, and she was dropped from it.  Regis did not readmit her until her Senior year, ruining her chances of graduating on time from Regis and requiring her to attend, and pay in full for, an two extra years at Regis.  Because of her damages, Hall seeks redress under Title IX of the Education Amendments of 1972, as amended 20 U.S.C.A. § 1681, M.G.L. c. 214 § 1C, § 504, Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and common law.

## JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over Hall's claims under Title IX of the Education Amendments of 1972, as amended 20 U.S.C.A. § 1681, under § 504, Rehabilitation Act of 1973, 29 U.S.C.A. § 794, and under Title II of the Americans with Disabilities Act, 42 U.S.C.S. § 12101 *et seq.*

2.     This Court has jurisdiction of Hall's state law claims under 28 U.S.C.S. § 1367.

## PARTIES

3.     The Plaintiff, Ashley Miyakoda Hall ("Hall"), is a current student at Regis College and a resident of Massachusetts at all times relevant to this Complaint.  Hall, as a student

at Regis, qualifies for the protections of Title IX, the Rehabilitation Act, Title II of the

Americans with Disabilities Act, and M.G.L. c. 214 § 1C.

4.      The Defendant, Regis College ("Regis"), is a private educational institution

located at 235 Wellesley Street, Weston, Massachusetts 02439 that is a recipient of federal funds.

Regis is an entity covered by Title IX, the Rehabilitation Act, Title II of the Americans with

Disabilities Act, and M.G.L. c. 214 § 1C.

### FACTS COMMON TO ALL COUNTS

5.      Hall enrolled as a Freshman student at Regis in 2014 with a scholarship half

funded by Regis.  Because of Hall's good academic record from high school, Regis accepted her

into the pre-Nursing major as a Freshman.

6.      Hall's acceptance into the pre-Nursing program as an undergraduate put her on

track to participate in Regis' Nursing program, which students apply for at the end of the spring

semester of their Sophomore year.

7.      Hall dreamed of becoming a nurse and chose Regis over other colleges that

admitted her, because of its highly-rated Nursing program.

8.      The Regis College School of Nursing & Health Sciences Handbook ("Nursing

School Handbook"), a supplement to the Regis College Student Handbook, governs students

enrolled in Undergraduate and Graduate nursing programs.

9.      According to the Nursing School Handbook, students admitted through direct

acceptance into the Nursing major as Freshman must maintain an overall 3.0 grade-point average

("GPA") in non-nursing prerequisite courses, and a 2.7 GPA or higher in Science and Nursing

prerequisite courses in order to secure Nursing program consideration.

10.     Hall finished her first semester at Regis with a 3.0 GPA.

11.     In November 2014, Hall began dating a fellow Regis student, John Flowers ("Flowers"), a fellow Freshman on Regis' soccer team.

12.     Hall is 5'0'' and weighs approximately 95 pounds. Flowers, is about a foot taller, has an athletic build, and weighs about 70 pounds more than Hall.

13.     Hall and Flowers' relationship was marked by abuse.

14.     In January or February, 2015, after seeing Hall had given her number to another male student, Flowers lost his temper, forcibly grabbing Hall's arms and pushing her against the wall in the dorm hallway.

15.     In March or April, 2015, Flowers, Hall and Hall's friend attended a campus party together. Hall became very intoxicated during the party.  Flowers had one beer. Flowers and Hall had sexual intercourse, for which Hall was too intoxicated to give consent.

16.     Hall had an anxiety attack over the incident and attempted to leave Flowers two days later, but he became upset and violent—cutting himself with a broken piece of plastic in front of her and telling her, "you made me do this."  Because of what he did, Hall continued the relationship, fearing that he would hurt himself further if she left.

17.     During August, 2015, Flowers was driving Hall's car with Hall as a passenger. During the trip, the two began arguing.  Flowers became irate, pulled over, and threw her car keys into a yard.  He then started to scream in her face. When she pushed him away from her, he grabbed her wrists tightly, to hold her down, and bruised her.

18.     Hall and Flowers broke up shortly after this incident.   A few weeks into the next school year, on September 9, 2015, Hall visited Flowers' room and the two talked about reconciling. At approximately 11:00pm, while they were talking, Hall received a text from another man.

4

19.     Flowers saw the text, grabbed her phone to read it.  He flew into a rage and started to look through the phone for more texts. Hall attempted to retrieve her phone, but because of his size, he held it away from her.

20.     In his rage, Flowers threw Hall's purse across the room, scattering her belongings. He left the room with her phone, shut the door, and held it shut as Hall tried to get out.

21.     After a couple minutes, Flowers returned into the room, grabbed Hall, wrapped his arms around her head, and held her face against his chest. When Hall cried out, Flowers let go and cornered her screaming that she was "worthless" and he "did not love her anymore."

22.     Flowers then threw Hall's phone and purse into the hall. As she picked up her scattered belongings, Hall realized that her wallet was still Flowers' room.  She knocked on his door to get it back.

23.     When she reentered Flowers' room, instead of giving her the wallet, he snatched her phone and began to go through it again.

24.     When Hall tried to get it back from him, he whipped around, raised his fists as if he were going to punch her in the face, and warned, "Don't make me hit you!".

25.     Hall attempted to take her phone.  In response, Flowers pulled her by her shirt and bra and shoved her against the wall, knocking her to the ground.

26.     When she got up, Flowers grabbed her by the throat, pressed his thumb into the center of the base of her neck and choked her to the point where she was desperate for air.

27.     Hall flailed trying to escape, scratching his chest in self-defense. Flowers pushed her against the wall again, his hand still around her throat. He then threw Hall onto the floor, pushing her when she tried to get up to keep her down.

28.     Hall curled up into a fetal position on the floor while Flowers stood over her shaking his fists as though he intended to hit her. Hall begged him "Please don't hit me! Please don't hurt me!".

29.     Once she was on the floor begging him not to harm her, Flowers turned back to going through Hall's phone. She got up and again tried to get her phone back. As Hall reached for her phone, Flowers elbowed her in her stomach and Hall, who was off balance and about to fall down from being hit, grabbed Flowers' back to steady herself, scratching him as she fell to the ground.  Flowers went into the hall with her phone.

30.     After Hall and Flowers had gone into hallway, around 11:15pm, one of the dorm Resident Assistants ("RAs"), who were assigned by Regis to monitory students in a dormitory, Ari, who had overheard them, rushed down the hall and separated them.

31.     Ari asked Hall if Flowers had physically hurt her, and Hall told her the details of the incident, including that Flowers had choked her.

32.     Upon separating Flowers and Hall, Ari texted other RAs in the dorm, Jeff, Dahisha, and Katie, asking them to assist her.

33.     Ari took Hall to her own dormitory and told Hall's dorm RA, Kristy, what had happened, as well as Hall's three roommates.

34.     After learning about Flowers' hitting and choking Hall, one of Hall's roommates, Emily, went to Flowers' room and asked, "Do you think it's okay to hit a woman?". Flowers responded by threatening Emily to "get out of my room before I do something." Emily reported his threat to Katie and Jeff, who had seen Emily go into Flowers' room.

35.     When the RA Jeff went to Flowers' room, he found him extremely agitated, unable to be calmed, and punching his bed.

36.     Flowers admitted to Dahisha that they had fought, that things had "escalated," and that he choked Hall.  He claimed he acted in "self-defense."

37.     Flowers showed Ari the scratches from Hall trying to defend herself, claimed they were from her attacking him, and demanded that they be photographed. Dahisha offered Flowers another room for the night to ensure his safety. No one offered Hall an alternative, safe space in which to spend the night nor any other interim steps to ensure her safety.

38.     Flowers' relationship abuse and assault of Hall created an intimidating, hostile, and unsafe learning environment for Hall because of her sex that, because of its violent nature, created a severe, pervasive and objectively offensive environment for any reasonable person.

39.     Flowers' assault and abuse of Hall was based on gender because it was based on the stereotype that males can emotionally or physically women, particularly for infidelity.  Both Flowers' abuse and his assault triggered Regis' obligation to investigate and take appropriate remedial action.

40.     Regis owed a duty to Hall, as a student, to reasonably keep her safe from sexual assault and not to subject her to a severe, pervasive, and offensive environment based on her sex.

41.     Over the course of their relationship, Regis became aware of Flowers' pattern of abuse and failed to take appropriate remedial action.

42.     Flowers was physically aggressive when he got upset with Hall.  He raised his voice at Hall, slammed doors and broke objects.  During their fights, he punched walls, doors, and his bed.  He punched a hole through his closet door and another hole in his dresser drawer. The RAs in their dormitories overheard him in several instances.

43.     For example, an RA named Kaileen, after hearing Flowers yelling at Hall and throwing a water bottle at her dormroom door, intervened and escorted Flowers out Hall's room.

Hall told Kaileen that Flowers typically punched and slammed objects and yelled loudly at Hall when he was upset with her.  Kaileen never provided Hall with information about Regis services for women in violent relationships and never reported the incident.

44.    During another incident a couple months later, an RA from Flowers' dorm came into Flowers' room because Flowers was yelling so loudly at Hall. Flowers told the RA that everything was fine and the RA did not investigate the fight any further or make a report.

45.    Flowers told the Director of Residence Life, Bridget, that he often had intense fights with Hall. Bridget never contacted Hall, did not refer Flowers to any services, nor made a report.

46.    The RAs and Director of Residence Life had authority which gave Regis actual knowledge of the hostile educational environment that Flowers created for Hall.

47.    The inaction of the RAs and Director of Residence Life demonstrates Regis failed to adequately train them to take appropriate remedial action in response to very clear signs of abuse.

48.    Regis' failure to adequately train the individuals it entrusted to monitor students demonstrates that it failed to take action to ensure that it provided a safe and non-abusive environment based on sex for its students.

49.    Regis also failed to take appropriate remedial action to protect Hall from a hostile educational environment based on sex after Flowers' assault, showing deliberate indifference to the harassment and making her more vulnerable for it to reoccur.

50.    For example, the RAs showed preferential treatment to Flowers by offering him an alternative, safe space and not offering the same to Hall.

51.     Additionally, none of the RAs reported Hall's assault Regis Campus Police or notified Hall that she had the option to report Flowers' assault to the police.

52.     The next morning, September 10, 2015 at 10:35am, Hall and her roommate reported Flowers' assault to the Regis Campus Police. Hall gave a statement to two police officers.  It was the first time Regis Campus Police heard about the incident.

53.     Hall showed the Regis Campus Police officers her bruises from when Flowers forcibly grabbed her in August, 2015 to substantiate his abuse. No one from the Regis Campus Police photographed Hall's bruises.

54.     After the assault, Hall developed two large bruises along her spine, two bruises on her wrists, and one on her left forearm. She had a large bruise on the base of her neck where Flowers choked her. Hall took pictures of the bruises when they appeared.

55.     When interviewed by the Regis Campus Police, Flowers admitted to pushing Hall and that he had "lost control" and claimed that Hall attacked him.

56.     The large and obvious discrepancy in weight, height, and strength between Hall and Flowers makes his story that she attacked him implausible on its face.

57.     Hall applied for, and received, a restraining order against Flowers from the Waltham District Court later in the day on September 10, 2017.

58.     The restraining order required that Flowers stay away from Regis College, keep 100 yards away from Hall, and stay away from Hall's home residence. The Court required Hall and Flowers return in ten days.

59.     Regis Campus Police served Flowers with the restraining order at 6:15pm on September 10, 2017.  Despite the requirement of the order to stay away from Regis College, he remained on campus.

60.     On September 10, 2015, Regis opened an investigation into Flowers' assault. Adam Thrasher (Thrasher"), who was assigned to investigate Flowers' assault, at some point issued an indefinite "mutual" no-contact order to Flowers and Hall.

61.     Hall did not receive the mutual no-contact order until approximately thirty days later.

62.     Regis moved Flowers to a single room, a preferred housing arrangement for students, in a building attached to Hall's dormitory.

63.     Issuing a mutual no-contact order and moving Flowers to a single room in a building attached to Hall's dormitory which allowed him easy access to Hall were not appropriate remedial actions.  Neither was calculated to protect Hall from Flowers.

64.     Rather, the mutual no-contact order validated Flowers' claim that he was attacked, although Regis had information about his previous violent behavior and the difference in their sizes that made his claims obviously untrue.

65.     Moving Flowers into a preferred housing arrangement in close proximity to Hall gave him the opportunity to continue to create a hostile educational environment towards Hall.

66.     Regis' actions showed deliberate indifference to Hall's right to be free from a gender based hostile educational environment.

67.     On September 11, 2015, the Regis Campus Police submitted its report of the assault to the school and Thrasher. Regis did not report the assault to the Waltham police or the District Attorney's office.

68.     On that same day, Hall notified Thrasher that she obtained a restraining order against Flowers, which required that Flowers stay away from Regis College; that Flowers, who

had not left the campus, was violating the restraining order; and that she was "scared for [her] safety."

69.     The next action Regis took was for the Chief of the Regis Campus Police to go to the Waltham District Court on to amend it so that Flowers could remain on campus.

70.     Thrasher then notified Hall that the restraining order was amended.  Hall reiterated to him that she did not feel she was safe or that she was being treated equally.

71.     No one discussed with Hall potential interim measures that could be used to protect her from further abuse during the investigation. This showed deliberate indifference to her safety, while providing preferential treatment to her male abuser.

72.     By amending the restraining order so that Flowers could stay on campus, Regis made it easier for Flowers to have access to Hall, aided him in creating a hostile educational environment for Hall because of her sex, and put her in greater danger of repeat violence. Through these actions, Regis failed to take appropriate remedial steps to protect Hall from a hostile educational environment.

73.     On September 18, 2015, Title IX investigators, Evan Maloney ("Maloney") and Jennifer Hunt ("Hunt"), interviewed Hall. Thrasher interviewed Flowers.

74.     Hall explained the details of Flowers' assault on September 9 and the history of Flowers' emotional and physical abuse. During this interview, Hall also disclosed that she and Flowers had sexual intercourse when she was unable to consent, although she asked not to include it as part of the investigation.

75.     Neither Maloney nor Hunt asked Hall about any physical harm she suffered through the attack, although the campus police report, that was part of Regis' investigation, contained statements about Flowers' previous physical harm to her during the car trip in August.

76.     Hall explained that other RAs had overheard Flowers' yelling at her and had intervened, as well as that she had spoken about Flowers' violence to her RA from the previous year, Kaileen.

77.     None of the RAs Hall identified to Maloney and Hunt were interviewed.

78.     RAs Jeff, Dahisha, Katie and Ari, who were present the night of Flowers' assault were not interviewed.

79.     No one interviewed any of Hall's friends or roommates which would have corroborated Hall's account of Flowers' past abuse, including Hall's roommate, Emily, whom Flowers threatened the night of the assault.

80.     Instead, the investigators relied on reports the RAs wrote the night of Flowers' assault.

81.     The Title IX investigators choosing not to follow up on Hall's evidence of Flowers' pattern of abuse against her was clearly unreasonable given the circumstances. Ignoring evidence of Flowers' pattern of abuse gave preferential treatment to Flowers and shows deliberate indifference to the creation of a hostile educational environment based on sex.

82.     Regis showed preferential treatment to Flowers and was deliberately indifferent to the creation of a hostile educational environment based on sex in other ways as well.  For example, Maloney and Hunt, did not give Hall an opportunity to review notes of her interview to ensure that they were accurate or to add to or amend her statements from her interview.

83.     They never interviewed Hall about Flowers' scratches, or gave her an opportunity to rebut his version of the assault.

84.     Hall was not shown any of the RAs' written statements or Flowers' statement. Regis did, however, provide these documents to Flowers' criminal defense attorney.

85.     The RAs' written statements contained inaccuracies, but Regis did not give Hall the opportunity to review and respond.

86.     Further showing its deliberate indifference to the creation of a hostile education environment based on sex, Regis assisted Flowers with his criminal defense.

87.     On September 24, 2015, the restraining order return date, the Chief of the Regis Campus Police accompanied Flowers and his lawyer to the Waltham District Court.

88.     Flowers and his attorney attempted to minimize the reach of the restraining order. Regis supported Flowers, while Hall petitioned the Court to extend the restraining order.

89.     On September 30, 2015, Thrasher found both Flowers and Hall in violation of the Regis Sexual Violence Policy and the Regis Code of Conduct.  Thrasher did not explain the basis for his conclusion or provide any specifics about the violations Hall allegedly committed.

90.     Thrasher forwarded the report to Student Dean Walter Horner ("Horner") who was to make the final decision.

91.     That same day, Thrasher informed Hall that the report had been referred to Horner for a final decision.  However, neither he, nor anyone else at Regis, ever informed Hall that she had become a target of the investigation for violating Regis's Sexual Violence Policy or the Regis Code of Conduct.

92.     All of Regis' actions after the discovery of Flowers' assault on Hall shows that its investigation and the other ways it responded to the incident failed to meet the requirements of the law and was so inadequate as to be a failure to investigate.

93.     On October 13, 2015, Horner adopted Thrasher's report and its findings and both were put on "Final Probation."

94.     The Final Probation status remained on Hall's record for one year and was visible to other schools in the event she tried to transfer.  Hall was also at risk for suspension or expulsion upon any finding she violated other school policies.

95.     Placing responsibility on Hall, as a female, for the violence of her male abuser was an act of discrimination because it is based on a stereotype that a female should not act in a way to provoke a male abuser.

96.     Punishing Hall for her response to an act of gender based violence perpetuates the sex stereotype that females are responsible for assaults against them.

97.     Regis acted to protect Flowers, despite Hall's showing that his abuse was severe, pervasive, and repetitive, and placed blame on both Flowers and Hall to keep Flowers, the male abuser, from receiving greater punishment. Through its actions, Regis acted in deliberate disregard for Hall's right to be free from a hostile environment based on her sex.

98.     After receiving the notice that she had been investigated and put on Final Probation, Hall protested the findings to Thrasher and Maloney.

99.     Regis never notified Hall of her right to go to the Office of Civil Rights to report the incident and start an investigation through it.

100.    On October 21, 2015, about one week after Regis released the results of its investigation, Flowers violated the Waltham District Court's restraining order while the two were in the school cafeteria, staring threateningly, and pointing at her as he talked to other students.

101.    Flowers was able to violate the restraining order because Regis failed in its duty to maintain a safe campus for Hall.

102.     When Flowers violated the restraining order, he also violated Regis' no-contact order, which shows that it was ineffective as a remedial measure.

103.     Hall reported the violation, and Flowers was arrested for violating the restraining order on October 22, 2015.  After his arrest, the District Attorney who handled the violation of the restraining order received the Regis Campus Police report about Flowers' assault on Hall.

104.     After reviewing the information from the Regis Campus Police, the District Attorney immediately initiated an assault and battery complaint against Flowers.

105.     On January 4, 2016, the Waltham District Court renewed Hall's restraining order against Flowers for another year, and Flowers was arraigned for criminal assault and battery.

106.     On July 7, 2017, the Waltham District Court found Flowers guilty of criminal assault and battery of Hall and violation of the restraining order.

107.     Regis' policy in its Student Handbook promises to provide its students a safe, non-discriminatory educational environment.

108.     Regis' policies as set out in its Student Handbook created a contract with its students.

109.     Hall accepted that contract by accepting a scholarship from Regis, enrolling, and paying tuition as a student at Regis.

110.     Hall reasonably relied on Regis' representation that it would follow the policies as set out in its Student Handbook, and continued to enroll in and pay tuition at Regis in reasonable reliance of her expectation that Regis would follow the policies as set out in its Student Handbook.

111.     Regis failed in its duty to keep Hall safe from assault and a hostile environment based on her gender by failing to act equitably and reasonably following Flowers' assault, and

through its deliberate indifference, by failing to remedy the hostile environment Flowers created for Hall.

112.   It was reasonably foreseeable that Flowers would retaliate against Hall for initiating a complaint about the assault, especially since Regis had knowledge of his pattern of abuse against Hall.

113.   Regis' failure to take prompt remedial action to protect Hall from Flowers' retaliation and harassment when he violated the no-contact and restraining orders, and its deliberate indifference, caused a safety threat to continue for both Hall and the rest of the Regis student community and failed to provide a safe, non-discriminatory educational environment as promised in the Student Handbook.

114.   As a result of Flowers' abuse, assault, and violation of the restraining order, and because of Regis' failure to remedy the situation and create a safe educational environment, Hall suffered emotional trauma and distress.

115.   Because of the ongoing stress and anxiety, her grades fell. In the Spring semester of 2016, Hall's grades were mostly C's and D's.

116.   In the Spring semester of 2016, Regis told Hall that she was unlikely to continue into the Nursing program because of her grades.

117.   Hall has learning disabilities, severe dyslexia and attention deficit disorder (ADD).

118.   Dyslexia interferes with Hall's cognitive and comprehension skills, particularly reading, reading comprehension, and spelling, substantially interfing with her ability to learn.

119.    ADD interferes with Hall's ability to focus and concentrate, particularly paying attention to lectures, sitting still during classes, and taking examinations, substantially interfering with her ability to learn.

120.    Hall requires multiple accommodations, including more time to take examinations and complete assignments, multiple tutors, having a quiet room free of distractions when she takes her examinations, and using visual aids and special materials to assist her in maintaining attention and learning.

121.    Hall is a disabled person as defined by the American with Disabilities Act and the Rehabilitation Act of 1973.

122.    After enrolling at Regis, Hall sought accommodations through Regis' Disability Center, making Regis aware of her learning disabilities.

123.    The stress and anxiety from Flowers' assault and violation of the restraining order, and Regis' failure to remedy the situation and create a safe educational environment, exacerbated the effects of her disabilities on her ability to learn.

124.    In light of the trauma from being attacked by Flowers, having the accommodations she requires was particularly important.

125.    Instead, Hall's Nursing advisor at Regis, despite being aware of Hall's learning disabilities, ordered her to increase her course load to take five classes during her Spring semester of Sophomore year, greater than the typical courseload even for a student without learning disabilities, in order to maintain eligibility for the Nursing program.

126.    Increasing Hall's course load was a failure to accommodate Hall's learning disabilities as required by law which undermined her ability to obtain an education.

127.    Regis additionally undermined Hall's ability to obtain an education by outright denying her a simple accommodation.  The Regis Nursing program requires one foreign language course, either Spanish or Portugeuse for Health Professionals.  Because dyslexia makes it almost impossible to learn a foreign language, Hall requires an accommodation to fulfill this requirement.

128.    The Nursing Curriculum Plan, which designates the courses that Undergraduate students in the Nursing program must take to graduate with a Nursing degree, states that, "[i]f a student is not eligible to take either of the suggested [foreign language] courses the student must take an Expressive Arts course."

129.    Regis' Student Disability Services Policies also provide that a student who is unable to complete a foreign language class because of a disability, despite a "sincere effort," may take an alternate course to fulfill the requirement.

130.    Another Nursing program student who has dyslexia and who graduated in 2017 substituted an expressive arts course for the foreign language requirement without having to prove a "sincere effort" in taking a forieng language class.   Hall met with her academic advisor and the Dean of Students multiple times during her Sophomore year requesting the same accommodation.

131.    Regis rejected Hall's request although the accommodation of the other student shows that there was no undue hardship and Regis' own policies promise that it will make such an accommodation.

132.    Additionally, Hall had formally requested through the Disability Center that she be allowed to take her examinations there, which was granted.  Despite her request, her Spanish

professor forced her to take all of her examinations in the classroom, rather than at the Disability Services building.

133.    Forcing Hall to take her exams in a classroom put her at a disadvantage because easily distracted and she was unable to concentrate.

134.    Hall reported her Spanish professor's failure to accommodate her disability by allowing her to take exams at the Disability Center.  Regis took no action in response.

135.    As a result of Regis refusal to accommodate her, she failed her Spanish language course, despite engaging three tutors to assist her.

136.    The trauma of the attack and the failure to accommodate her caused Hall's GPA to fall from a 3.0 to a 1.738.

137.    As a result, Hall was put on academic probation for the Spring 2016 semester and was dropped from the nursing pre-requisite courses she had enrolled in for her Junior year, which made her ineligible to continue in the Nursing program.

138.    Regis' Student Disability Services Policies and Nursing Curriculum Plan are contracts between Regis and its students, and Regis promised through it to follow the policies set forth in the Handbook.

139.    Hall accepted the contracts within the Regis' Student Disability Services Policies and the Nursing Curriculum Plan through accepting a scholarship, enrolling and paying tuition to Regis.

140.    Hall reasonably relied on Regis' representation that it would follow the Student Disability Services Policies and Nursing Curriculum Plan as written and continued to attend and pay tuition at Regis in reasonable reliance of the representation that Regis would follow the policies as written.

141.    Regis breached its contract with Hall by failing to provide her with accommodations as it promised it would.

142.    Hall's is qualified individual for Regis' Nursing program if she is accommodated. Regis' denial of Hall's requests for accommodations, including a course load she could reasonable handle as a disabled person, accommodations for testing, and the replacement of the foreign language requirement, were in deliberate indifference to Hall's learning disabilities and were one of the causes for her lower GPA during her Sophomore year.

143.    At the beginning of her Junior year, Hall met with her advisor, the Director of the Nursing program, and asked how to continue with the Nursing program.

144.    Instead of working with her to continue with the Nursing program, the Director of the Nursing program pushed her out of it, telling Hall it was a "waste of time and money" to continue with the Nursing program.  Hall's advisor failed to give her any information about the appeals process she could have used to re-enter the Nursing program.

145.    On August 3, 2016, through her attorney, Hall complained about Regis's response to Flowers' abuse, its failure to remedy a hostile education environment based on gender, and its failure to provide reasonable accommodations for her learning disabilities.  She made several proposals to accommodate her.

146.    Regis rejected Hall's proposals for accommodations and offered nothing in response except for Hall to file an appeal. Regis' denial of Hall's requests for accommodations where there was no undue hardship is in retaliation for Hall's complaints that it had allowed a hostile education environment to continue and had not taken adequate steps to remedy that environment.

147.     Hall appealed Regis' decision to drop her from the Nursing program and was re-accepted.  However, she could not recommence her course of study until the Spring semester of her Senior year.

148.     Per Regis' handbook, Hall was permitted to replace two of her failing grades in courses with grades in courses she retook.

149.     Although readmitted to the Nursing program, Hall is not permitted to replace her failing grade in a third Nursing course, Nutrition Along Health Continuum, which she failed as a result of the hostile education environment and the failure to accommodate her disabilities.

150.     Because Regis failed to accommodate her initially, although she has been readmitted to the Nursing program, Hall has also lost the ability to retake any more classes because Regis has forced her to use her "retakes" on failures that occurred because of its failure to accommodate her and its failure to remedy a hostile educational environment.

151.     Because of her academic performance during the second semester of her Sophomore year and being dropped from the Nursing program during her Junior year, Hall will not graduate on time and must pay for at least an extra two years' tuition to finish her degree at Regis. Her scholarship will not cover the extra time necessary to complete the nursing degree.

152.     Regis' deliberately indifferent response to the severe, pervasive, and objectively offensive educational environment and its failure to provide Hall with reasonable accommodations has caused Hall damages including: loss of academic opportunity, additional tuition costs, emotional distress, and other damages.

## COUNT I
### Violation of Title IX,
### 20 U.S.C.A. § 1681

The actions of Regis, as set forth above, and incorporated by reference herein, constituted a violation of Title IX, by subjecting Hall to a severe, pervasive, and objectively offensive hostile and discriminatory educational environment based on her gender.

## COUNT II
### Violation of M.G.L. c. 214 § 1C

The actions of Regis, as set forth above, and incorporated by reference herein, constituted a violation of Mass. Gen. Laws ch. 214, § 1C, by subjecting Hall to severe, pervasive, and objectively offensive sexual harassment.

## COUNT III
### Violation of § 504 of the Rehabilitation Act of 1973,
### 29 U.S.C.A. § 794

The actions of Regis as set forth above, and incorporated by reference herein, constitute disability discrimination and failure to provide reasonable accommodations as a violation of **§ 504 of the Rehabilitation Act of 1973**.

## COUNT IV
### Violation of Title III of the Americans with Disabilities Act,
### 42 U.S.C.S. § 12101 *et seq.*

The actions of Regis as set forth above, and incorporated by reference herein, constitute disability discrimination and failure to provide reasonable accommodations as a violation of Title III of the ADA.

## COUNT V
### Breach of Contract

The actions of Regis as set forth above, and incorporated by reference herein, constitute a breach of contract under Massachusetts common law.

## COUNT VI
### Promissory Estoppel

The actions of Regis as set forth above, and incorporated by reference herein, induced Hall to rely on its promise of a safe, non-discriminatory learning environment and caused her damages for which it is responsible.

## COUNT VII
### Negligence

The actions of Regis as set forth above, and incorporated by reference herein, constitute negligence under Massachusetts common law.

## COUNT VIII
### Negligent Infliction of Emotional Distress

The actions of Regis as set forth above, and incorporated by reference herein, constitute negligent infliction of emotional distress under Massachusetts common law.

## PRAYER FOR RELIEF

WHEREFORE, Hall demands judgment in her favor on all counts and respectfully requests that this Honorable Court order the following relief to Hall:

1. Order Regis to pay all damages to Hall provided for all statutory and common law violations, including for:

   a. Hall's emotional distress, loss of academic opportunity, excess tuition that she will incur because of lost time from the Nursing program and unreimbursed out of pocket expenses incurred in response to these circumstances;

   b. Punitive damages;

   c. Statutory interest;

   d. Attorney's fees and costs;

2. Equitable and/or injunctive relief including:

a.  Order Regis to remove the academic probation from Hall's academic record;

b.  Order that Regis allow Hall to take an expressive arts course in replacement of her foreign language requirement for the Nursing program;

c.  Order Regis to exclude Hall's grade in Spanish from her GPA calculation;

d.  Order Regis to allow Hall two more "retakes" for courses she may not pass that are requirements of the Nursing program;

e.  Order Regis to allow Hall to replace her grade in Nutrition Along Health Continuum with the passing grade she achieved after she retook the course;

f.  Order Regis to continue Hall's scholarship for the two years of excess tuition that she will incure because of lost time from the Nursing program;

g.  Order Regis to take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in its education programs, including, but not limited to: fully investigating conduct that may constitute sex-based harassment and/or sexual assault, appropriately responding to all conduct that may constitute sex-based harassment and/or sexual assault, and mitigating effects of harassment and/or assault by eliminating any hostile environment that may arise from and contribute to it.

3.  Award any other relief the Court deems just and proper.

## JURY DEMAND

Hall requests a trial by jury on all counts so triable.

Respectfully submitted,
ASHLEY MIYAKODA HALL,
By her attorneys,

Dated: January 24, 2018

_____
Rebecca G. Pontikes, BBO# 637157
Bryn Sfetsios, BBO# 688368
PONTIKES LAW, LLC
10 Tremont Street, 2nd Floor
Boston, MA 02108
(617) 357-1888
rpontikes@pontikeslawllc.com
bsfetsios@pontikeslawllc.com